UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Carol Bailey Lazu, | ) | |
| | ) | C/A No.: 4:13-cv-3609-TER |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| CAROLYN W. COLVIN, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civil Rule 73.01(B) (D.S.C.), and the Honorable Bruce Howe Hendricks' August 27, 2014, order referring this matter for disposition. Entry # 24. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals.

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.    Relevant Background

A.    Procedural History

On August 15, 2011, Plaintiff filed applications for DIB and SSI in which she alleged her

1

disability began on March 15, 2011. Tr. at 10, 48, 171-179. Her application was denied initially and upon reconsideration. Tr. at 47-78, 79-108. On August 20, 2012, Plaintiff had a hearing before an Administrative Law Judge ("ALJ"). Tr. at 25-46 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 21, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 7–24. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 30, 2013. Entry # 1.

      B.    Plaintiff's Background and Medical History

          1.    Background

Plaintiff was born on October 1, 1966, and was 44 years old on the alleged disability onset date. Tr. at 19. She has a high school education. Id. She as past relevant work ("PRW") as a general manager at a hotel, a housekeeping manager, a waitress, and a front desk clerk. Tr. at 18. She alleges she has been unable to work since March 15, 2011. Tr. at 10.

          2.    Medical History

          a.    Records Prior to Plaintiff's Alleged Onset Date[1]

Treatment notes from Dr. Joseph D. Ewens from 2006 to 2008 reflect that Dr. Ewens was Plaintiff's primary care doctor. Tr. 480-493. His records reflect diagnoses of bipolar disorder, alcohol dependence, and hernia repair.

In June 2008, records indicate that Plaintiff presented to the emergency room with complaints of generalized weakness, slurred speech and problems with standing and walking. Tr. 358-360. It

---

[1]Certain records pre-dating the alleged disability onset date are included for background purposes.

was noted that she had a surgical wound from gastric bypass surgery that had never closed. Tr. 360. She was admitted to the hospital and the stroke protocol was followed. Tr. 370. Ultimately it was indicated that her weakness was most likely secondary to dehydration, anemia, malnutrition and depression rather than a stroke. Tr. 377. An MRI of Plaintiff's lumbar spine from June 2008 indicated moderate canal and foraminal narrowing at L4-5 due to an annular disc bulge and facet joint hypertrophy. Minimal foraminal narrowing is also noted on the left at L3-4. Tr. 336.

From December 29, 2008 to January 28, 2009, Plaintiff was treated at a rehabilitation center in Columbia, South Carolina. She had been committed by her mother after a ten day drinking binge. Her discharge diagnoses are: Axis I-Alcohol Dependence, Bipolar Disorder; Axis II-Cluster B traits;[2] Axis III-Cerebrovascular Disease, Abdominal Wound Stable; Axis IV-Chronic Substance Abuse; and Axis V-GAF 50 on admission. Tr 467-469. She was stabilized, participated in treatment and released to a halfway house. Id. She was on Prozac and Lithium at the time of discharge. Id.

b.     Records After Plaintiff's Alleged Onset Date

On March 20, 2011, Plaintiff presented to the MUSC emergency department complaining of chest pain and shortness of breath for two weeks. Tr. 281-282, 289. She also reported back pain. Id. A radiology report reflected normal coronary arteries without evidence of pulmonary embolism or acute aortic syndrome. Tr. 289. The final diagnosis was acute chest pain. Id.

Plaintiff presented to Doctor's Care on May 13, 2011 with complaints of back pain. Tr. 251-253. It was noted that she had a history of low level back pain. X-rays noted degenerative disc

---

[2]"Cluster B personality disorders are characterized by dramatic, emotional or unpredictable thinking or behavior. They include antisocial personality disorder, borderline personality disorder, histrionic personality disorder and narcissistic personality disorder."
http://www.mayoclinic.org/diseases-conditions/personality-disorders/basics/symptoms/con-20030111

disease at L4-5, mild elsewhere. On exam, she had positive straight leg raises bilaterally at 45 degrees. She was prescribed Nucynta, Prednisone, and Flexeril and instructed to apply ice. Plaintiff was referred to a spine specialist for further evaluation.

She was seen at Carolina Family Care on May 18, 2011 with a "new" complaint of back pain Tr. 260. She reported chronic pain over the last two years which had been worse in her current job. She was also suffering from hyperglycemia with obesity, GERD, and alcoholism. Her last relapse had been the weekend prior and she admitted blacking out. This was mixed with a history of depression and bipolar disorder as well as anxiety. She was instructed to restart Alcoholics Anonymous (AA) meetings.

On June 7, 2011, Plaintiff presented to Dr. John Alexander of Spine and Orthopedic Specialists for an initial appointment for chronic back and leg pain. Tr. 270-275. She reported intermittent radiation to her legs with pain and paresthesias. Her past medical history was significant for gastric bypass, hernia repair, osteoarthritis, and osteoporosis. On exam, she showed mild gait antalgia and tenderness as L5-S1. There was mild pain with lumbar extension, none with flexion. Straight leg raise was unremarkable. Dr. Alexander's assessment was chronic lumbar pain with intermittent radiation and reported pain and paresthesias. He recommended a lumbar MRI and possibly a lumbar epidural steroid injection. He advised Plaintiff to work light duty with no lifting over 15 pounds.

An MRI of the lumbar spine on June 8, 2011 showed mild to moderate degenerative disc disease most pronounced at L4-5. Tr. 278. There was a central and paracentral right disc extrusion at L4-5, and grade I degenerative retrolisthesis of L4 on L5. It was noted that correlation for symptoms in the distribution of both L5 nerves was suggested based on contact of the transitioning L5 nerve roots and possible effect on the right L5 nerve root. Id.

4

Dr. Alexander administered a right sided epidural steroid injection at L4-5 on June 9, 2011. Tr. 277.

Plaintiff returned to Carolina Family Care on June 15, 2011 for a routine follow up and pap smear. Tr. 258. Her active problems included impaired glucose tolerance, alcohol dependence, low back pain, and depression. Plaintiff reported that she was going to AA meetings following a relapse triggered by losing her job. As a result, she was also about to lose her health insurance. Dr. Alexander had administered a steroid injection which had helped her back pain. Her depression was marked by poor motivation, low energy, and hopelessness. Celexa was prescribed.

On June 21, 2011, Plaintiff returned to Dr. Alexander. She reported a 50 to 60 percent improvement in her back pain following the injection, although her symptoms did continue with certain activities. Tr. 269. On exam, she had decreased lumbosacral tenderness, and it was noted that her motor, sensory, DTR's were intact for the lower extremities. Dr. Alexander noted that Plaintiff preferred not to undergo surgery. He planned a repeat nerve block. He also noted that she had lost her job recently due to restrictions in ability to perform work activities.

Dr. Alexander administered a second epidural steroid injection on June 23, 2011. Tr 276.

On October 14, 2011, examiner Georgia Bixler of the state agency contacted Plaintiff to question her about her activities. Tr 296. Plaintiff reported that she had not had any recent psychiatric hospitalizations, but work and being around people caused her anxiety. She spent time with her husband and mother. Plaintiff reported that she attended church once a month. She also indicated that she enjoyed cooking, and reading recipes. She was noted to shop regularly and drive. Plaintiff indicated that her mental health treatment had ended earlier in 2011 when she lost her job and health insurance. She reported that she had been fired because of excessive absences due to back pain. Her anxiety had also interfered with her employment in the past. She experienced anxiety and had

5

become upset and had verbal outbursts with her supervisors and coworkers.

Plaintiff reported a 2008 stay at Morris village for rehabilitation related to alcohol use, and a 2007 trip to the hospital after passing out. Plaintiff indicated that at the time of contact, she had been sober for 6-8 months. Plaintiff indicated that she was not currently receiving treatment for her bipolar diagnosis because she was embarrassed to tell her doctor about it.

Dr. Bonnie Cleaveland, Ph.D. examined Plaintiff on October 31, 2011 at the request of the state agency. Tr 297-300. Dr. Cleaveland noted that bipolar depression, anxiety and substance abuse were the conditions alleged. The only record available for Dr. Cleaveland was the interview notes from Georgia Bixler dated October 14, 2011. Dr. Cleaveland did note at the beginning of her report that the findings therein were considered by her to a valid indicator of her level of functioning.

Plaintiff arrived on time to the interview with Dr. Cleaveland. She was poorly groomed and casually dressed. Plaintiff was noted to be very talkative, answering questions with more detail than was required, often getting off-topic. Plaintiff indicated that she was applying for disability due to her bipolar disorder and physical problems with her back. Plaintiff indicated that she has had a number of jobs, but she typically is fired or quits. She admitted that this was sometimes due to her anxiety and sometimes due to relapsing into alcohol use. She also indicated that she wants psychiatric care, but can never keep a job long enough to get insurance, and is scared of the public clinics.

During her interview, Plaintiff endorsed poor sleep. She said, "when I'm having a good day, I'm having the best day of my life." Plaintiff also indicated that her depression is better and that her current doctor does not know she has bipolar disorder. She was noted to say that "everybody's happy when I'm happy." Dr. Cleaveland observed that it sounded as though she was endorsing hypomania rather than mania. Plaintiff stated that she did not answer the phone except for her mother, husband,

or daughter, did not go places by herself, and felt that her husband protected her. She had a history of psychiatric hospitalizations dating back to her teenage years. She also had a history of homelessness. Regarding alcohol, she reported a few days of relapse over the past few years. Her current family situation was described as supportive and helpful to her sobriety.

At prior jobs, Plaintiff reported that she had been told she rambles and has been told she is too emotional and takes things too personally. At her longest job, she had actually been promoted—"when I am on, I'm really good," but eventually started drinking too much at night and then at work and was eventually let go. She dropped out of high school, but got her GED. She had attempted college coursework but didn't finish, which she attributed to being unable to handle the stress.

Dr. Cleaveland administered a mental status exam. Plaintiff performed all of the subtests with average results. Based on this brief interview, Dr. Cleaveland opined that Plaintiff's activities of daily living were within normal limits and that she was only moderately impaired in social functioning. She also opined that Plaintiff would be able to manage funds if awarded. Finally, Dr. Cleaveland indicated that Plaintiff is able to concentrate on simple tasks and likely able to persist on complex tasks. Tr. 300.

On November 4, 2011, Plaintiff was examined by Dr. William Maguire, also at the request of the state agency. Tr 308-310. She presented with a chief complaint of back pain which had been steadily progressing. Plaintiff reported associated tingling, numbness, and pain in both of her legs. She reported that ice packs helped while lifting or doing housework exacerbated it. Plaintiff estimated that she could walk for 30 minutes and stand for 20 before her pain became incapacitating. She reported that injections were slightly helpful.

She reported poor sleep. Dr. Maguire noted that Plaintiff appeared to be in no acute distress. Plaintiff was noted to get on and off the exam table and walk in and out of the office without any

7

apparent difficulty. She did not appear to be in pain, and did not limp. Plaintiff was found to have no low back tenderness. She had mild straight leg raising pain on the right, but none on the left. She was noted to have normal sensory and motor function and deep tendon reflexes in her legs. In terms of records, the state agency had provided Dr. Maguire with "some records from doctors care that simply outlines what medicines she is on" and a note from Dr. Alexander which indicated that Plaintiff had a right paracentral disc extrusion for which she had received an injection in June of that year. Dr. Maguire also had the benefit of a June 2011 MRI report. Dr. Maguire described the MRI scan as "a very markedly abnormal MRI scan that explains the reason for the extreme pain that she is in." He concluded that she "would be very limited from carrying out most occupations that require her to be physically active and would be having a difficult time doing anything other than working in seated position."  Tr. 310.

A plan of care document from Charleston Mental Health indicates that Plaintiff began treatment in February 2012 for bipolar disorder. Tr. 314. She was to attend therapy twice per month, and take medication as prescribed by her doctor. Goals included compliance with her medication and counseling. Her own goal was to "feel normal, happy, and secure."

An initial clinical assessment dated February 27, 2012 indicates that Plaintiff presented for a psychiatric assessment due to past diagnoses of depression, anxiety, and bipolar disorder. Tr. 324-330. She admitted to difficulties with alcohol abuse, and relapsing when she was stressed. She was placed on Celexa eight months prior, and while Plaintiff indicated she wasn't sure this was the right medication for her, she was afraid to stop taking it. Plaintiff reported a history of hospitalization and treatment for her impairments. She endorsed poor sleep, racing thoughts, period of highs and lows, and mood swings. Energy and appetite were variable. She had period of impulsivity and periods where she felt hopeless and worthless. Plaintiff indicated that she had had "a hard time staying

employed because of irritab[ility], mood lability, and ang[ry] outbursts." Tr. 324. On exam, she was noted to have an anxious and depressed mood. She was easily distracted and appeared to have poor memory and decisionmaking abilities. Diagnoses included bipolar disorder, alcohol dependence and her GAF was estimated to be 58.  Tr. 329.

Her complaints on June 14, 2012 were similar when she was seen by Elizabeth Leonard, M.D. at Charleston Mental Health. Tr 319-323.  Her medications were altered. Plaintiff returned one week later to Charleston Mental Health and reported that her mood was "a little better." Tr. 316-318.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the August 20, 2012 hearing, Plaintiff testified that she lived in an apartment with her husband. Tr. 29-30. Plaintiff indicated that she had a driver's license, but no longer drove. Tr. 30. Plaintiff obtained her GED after dropping out of high school. Tr 31. Plaintiff testified that she had mostly worked in hotel housekeeping. She previously worked as a housekeeping manager which involved organizing employees' schedules, assigning tasks, disciplining employees, ordering and putting away stock, and occasionally chipping in to actually clean rooms. She would inspect rooms to ensure that they had been properly cleaned which involved lifting and moving furniture. She worked at one time as a general manager for a hotel. Tr. 34.

Plaintiff indicated that she had a significant weight gain in the past year due to inactivity. Tr 31-32. She stated that her husband did their laundry and she could help by sitting on the bed and folding clothes if he brought them to her. Tr. 30. Plaintiff stated she did not use a cane or an assistive device, but that she had trouble walking, had been falling a lot, and moved about by "hold[ing] on to things."  Tr. 32.

9

Plaintiff stated that she had constant pain in her back as well as pain related to an abdominal wound and possibly ulcers. Her back pain traveled to her legs (TR 38). Plaintiff indicated that she took Neurontin, ibuprofen, Aleve, and Xanax on a daily basis but that she hadn't taken all of her medications before the hearing because it would have prevented her from coming and that "I know I'm not coherent, but I wouldn't be at all coherent." Tr. 39. Plaintiff indicated that she took Prilosec for her stomach discomfort and had some incontinence.  Tr. 39-40. Plaintiff indicated that she had problems sitting, standing, and laying down.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Arthur F. Schmitt Brown reviewed the record and testified at the hearing. Tr. at 41–44. The VE categorized Plaintiff's PRW as follows: General manager, hotel – skilled, sedentary work; Housekeeping manager - semi-skilled, light work; Waitress - semi-skilled, light work; and Desk clerk, hotel – semi-skilled, light work. Tr 42-43. The ALJ described a hypothetical worker of Plaintiff's age, education and work experience who could do sedentary work, except the individual can also do simple, routine, repetitive tasks in a low-stress work environment with no production-paced work, minimal decision-making and no ongoing interaction with the public. Tr 43.   The worker was further limited to frequent use of foot controls, occasional postural movements, and no exposure to hazards. The ALJ stated that he understood such a worker could not perform Plaintiff's past work. The VE provided several examples of unskilled, sedentary work compatible with the restrictions in the ALJ's hypothetical, including surveillance system monitor, weight inspector, and a cutter and paster. Id.  The ALJ then asked whether there were jobs available to a worker who also needed to alternate positions at will at 30 minute intervals. The VE testified that weight inspector and cutter and paster occupations would not accommodate such a need, but the surveillance system monitor would remain, in addition to a laminator. Tr. 44. The VE testified that

an individual who could not tolerate the stress of a normal work environment would not be employable. Id. Likewise, an individual who, due to side-effects from medication, would need to take a two hour break every morning would not be capable of any jobs in the national economy.

2.     The ALJ's Findings

In his September 21, 2012, decision, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant last meets the insured status requirements of the Social Security Act through September 30, 2015.

2.     The claimant has not engaged in substantial gainful activity since March 15, 2011, the alleged onset date (20 CFR 404.1571 et seq. And 416.971 et seq.).

3.     The claimant has the following sever impairments: degenerative disc disease, obesity, and a bipolar disorder (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except with frequent operation of foot controls, occasional postural movements (climbing, balancing, stooping, kneeling, crouching and crawling) and avoidance of concentrated exposure to hazards. The claimant is also limited to the performance of simple, routine, repetitive tasks in a low stress environment, meaning no production-paced work and minimal decision making, that does not require ongoing interaction with the public.

6.     The claimant is unable to perform any past relevant work (20 CAR 404.1565 and 416.965).

7.     The claimant was born on October 1, 1966 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CAR 404.1563 and 416.963)

8.     The claimant has at least a high school education and is able to communicate in English (20 CAR 404.1564 and 416.964)

11

9.     Transferability of job skills in not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CAR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CAR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from March 15, 2011, through the date of this decision (20 CAR 404.1520(g) and 416.920(g)).

Tr. at 10–20.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

I.    The ALJ performed an incomplete step three analysis;

    A.    The ALJ did not address the question of medical equivalence

    B.    The ALJ did not consider Ms. Lazu's impairments in combination

II.    The ALJ's RFC analysis does not rest on substantial evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

    1.    The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12

consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. See, e.g., Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing SGA. See 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[3]The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); see Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4]In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d) (5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir.2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. Hall v. Harris, 658 F.2d 260, 264–65 (4th Cir.1981); see generally Bowen v. Yuckert, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. See id.; Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Walls, 296 F.3d at 290 (citing Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." Vitek v. Finch, 438 F.2d 1157, 1157–58 (4th Cir.1971); see Pyles v. Bowen, 849 F.2d

846, 848 (4th Cir.1988) (citing Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 390, 401; Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir.2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. See Vitek, 438 F.2d at 1157–58; see also Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir.1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir.1972).

B.     Analysis

Plaintiff contends that the ALJ erred in his Step three analysis in that he did not address the question of medical equivalence, and that the ALJ did not consider Plaintiff's impairments in combination. At step three of the sequential evaluation, the Commissioner must determine whether the claimant has an impairment that meets or equals the requirements of one of the impairments listed in the regulations and is therefore presumptively disabled. "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (emphasis added). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also meet the criteria found in the Listing of that impairment. 20 C.F.R. § § 404.1525(d), 416.925(d). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. 20 C.F.R. § § 404.1508, 416.908.

The Commissioner can also determine that the claimant's impairments are medically equivalent to a Listing, which occurs when an impairment is at least equal in severity and duration

to the criteria of a Listing. 20 C.F.R. §§ 404.1526(a), 416.926(a). There are three ways to establish medical equivalence: (1) if the claimant has an impairment found in the Listings, but does not exhibit one or more of the findings specified in the particular Listing or one of the findings is not as severe as specified in the particular Listing, then equivalence will be found if the claimant has "other findings related to [that] impairment that are at least of equal medical significance to the required criteria"; (2) if the claimant has an impairment not described in the Listings, but the findings related to the impairment are at least of equal medical significance to those of a particular Listing; or (3) if the claimant has a combination of impairments and no singular impairment meets a particular Listing, but the findings related to the impairments are at least of equal medical significance to those of a Listing. 20 C.F.R. §§ 404.1526(b), 416.926(b). Here, the ALJ noted that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

     Plaintiff concedes that she does not meet Listing 1.04, 12.04, nor 12.06 individually, rather she argues that "her impairments combined present findings of equal medical significance to the missing criteria." Pl. Reply Brief at 1. Plaintiff sets forth her argument that "her physical impairment meets some listing-level criteria, and her mental impairment meets yet others. The mental impairments cause findings 'of equal medical significance' to the missing physical criteria and vice versa." Pl. Br. at 12. The Court has carefully considered Plaintiff's argument, which she asserts is supported by the regulations, but ultimately finds her position to be unpersuasive.

     Although medical equivalence can be shown through different impairments, as logic would dictate they are generally impairments of a related nature. In Palmer v. Colvin, 2014 WL 3867830 (D.S.C.Aug. 5 2014), the Court had the opportunity to address a similar argument to that made by Plaintiff herein as to the issue of medical equivalence. In Palmer, the Court noted that the ALJ

16

explicitly considered and rejected the relevant Listings and ultimately concluded that the ALJ properly weighed the evidence and concluded that Plaintiff was capable of ambulating effectively and that her impairments did not meet Listings 1.02 or 1.03. The Court further concluded that the ALJ properly determined that Plaintiff's combination of impairments were not medically equal to a Listing with the following discussion:

> Because Plaintiff had evidence of major dysfunction of a peripheral weight-bearing joint and evidence of reconstructive surgery of a major weight-bearing joint, the ALJ would have had to determine that other findings related to her impairment were at least of medical significance to the required criteria under Listings 1.02 and 1.03 in order to determine that her impairments medically equaled the Listings. For example, a finding of medical equivalence would be supported if Plaintiff were unable to use the bilateral upper extremities. While Plaintiff has a right shoulder rotator cuff tear, the record contains no evidence that the rotator cuff tear significantly limits her ability to use her right upper extremity to utilize a cane, crutch, or walker. Where, as here, there is no evidence of other impairments of medical significance to Plaintiff's ability to ambulate effectively, medical equivalence to a Listing is not supported.

In the instant case, Plaintiff provides no support for how her existing physical impairments, coupled with her mental impairment and its resulting mild to moderate limitations are medically equivalent to any Listing. Accordingly, after careful review and consideration, the Court finds that ALJ's Step Three is supported by substantial evidence.

Plaintiff also makes a related argument that the ALJ did not consider her impairments in combination. When, as here, a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir.1989); see also Saxon v. Astrue, 662 F.Supp.2d 471, 479 (D.S.C.2009) (collecting cases in which courts in this District have reiterated importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner is required to "consider the combined effect of all of the

individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." <u>Walker</u>, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." <u>Id</u>.

At step three, as noted previously, the ALJ made the following findings:

> The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CAR Part 404, Subpart P, Appendix 1.

Tr. at 13.

The ALJ thoroughly discussed Plaintiff's back impairment, her obesity, as well as her mental impairments.  He further noted that "[t]he evidence fails to show that the claimant's obesity, either alone or in combination with her musculoskeletal impairment, has resulted in an inability to ambulate or perform fine and gross movements effectively." (Tr. 13). In formulating the RFC, the ALJ indicated that he "considered the claimant's back impairment and obesity by restricting her to sedentary work with frequent operation of foot controls, occasional postural movements and avoidance of concentrated exposure to hazards." (Tr. 17). He also indicated that he took into account the claimant's bipolar disorder by limiting her to the performance of simple, routine, repetitive tasks in a low stress environment, meaning no production-paced work and minimal decision making, that does not require ongoing interaction with the public. (Tr. 18).

The court finds that the ALJ's discussion of Plaintiff's combined impairments is sufficient under <u>Walker</u>. Furthermore, Plaintiff has offered no explanation of how more discussion of his combined impairments may have changed the outcome of this case or identified any additional restrictions that would flow from his combined impairments. For these reasons, the court finds the

ALJ's listing analysis sufficiently addressed Plaintiff's combined impairments and is supported by substantial evidence. See Brown v. Astrue, C/A No. 0:10–1584–RBH, 2012 WL 3716792, at *6 (D.S.C. Aug.28, 2012) (finding that Fourth Circuit precedent issued after Walker suggested that Walker was not meant to be used as a trap for the Commissioner).

Plaintiff's final argument is that the ALJ performed an improper credibility analysis because he failed to consider the entire case record when he found Plaintiff not credible. Pl. Br. at 14. Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged. See 20 C.F.R. § 404.1529; 20 C.F.R. § 416.929; SSR 96–7p; Craig v. Chater, 76 F.3d 585, 591–96 (4th Cir.1996) (discussing the regulation-based two-part test for evaluating pain). The first part of the test "does not ... entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain." 76 F.3d at 594 (internal quotation omitted). Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." Id. at 595. This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96–7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96–7p, ¶ 4.

If an ALJ rejects a claimant's testimony about his pain or physical condition, the ALJ must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence. Hatcher v. Sec'y, Dep't of Health & Human Servs., 898 F.2d 21, 23 (4th Cir.1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by

the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p, ¶ 5. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96–7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process. See Craig, 76 F.3d at 591–96. The ALJ found Plaintiff's medically-determinable impairments could reasonably be expected to cause some of the symptoms he alleged, but determined that Plaintiff's statements "concerning the intensity, persistence and limiting effects" of these symptoms was "not fully credible to the extent" the testimony was inconsistent with the ALJ's determination of his RFC. Tr. at 16. Specifically, in assessing Plaintiff's credibility, the ALJ concluded that:

> In summary, the undersigned considered the claimant's back impairment and obesity by limiting her to the performance of a range of light work[5] activity. The undersigned limited the claimant to the performance of simple, routine, repetitive tasks in a low

---

[5]This appears to be a scrivener's error, as the ALJ limited Plaintiff to sedentary work. Plaintiff makes no argument about this error.

stress environment, meaning no production-paced work and minimal decision making, that does not require ongoing interaction with the public in consideration of her mental impairment. However, in light of the evidence suggesting the claimant may have been overstating her symptoms, the undersigned cannot find the claimant's allegation that she is incapable of all work activity to be credible.

(Tr. 18).

In his decision, the ALJ noted specific inconsistencies in Plaintiff's testimony. The ALJ noted that although Plaintiff claimed that her back impairments caused problems with ambulation due to sensory loss, Dr. Maguire reported in November of 2011 that Plaintiff had no difficulty getting on and off the examination table, walked in and out of the office for her examination without difficulty, and had normal sensory and motor function with deep tendon reflexes. (Tr. 16). As to Plaintiff's testimony that she had suffered a stroke in the past, the ALJ noted that Plaintiff had no residual issues from her stroke, and that Dr. Alexander noted that her sensory, motor, and reflex examinations were normal. (Tr. 16, 269). Although Plaintiff complained of stomach discomfort and indicated that she needed to be near a bathroom due to problems related to her gastric bypass surgery, the ALJ noted there was no information of any consistent complaints to any treating source regarding stomach discomfort or bowel discomfort; and that Plaintiff had denied changes in bowel/bladder functions in a June 23, 2011 questionnaire. (Tr. 16). To the extent that Plaintiff claims the ALJ overlooked Dr. Maguire's statement that an MRI supported her allegations of disabling pain, the Court notes that Dr. Maguire reviewed that MRI and limited Plaintiff to work that could be carried out in a seated position. (Tr. 310). The ALJ, in turn, afforded that opinion great evidentiary weight. (Tr. 17). The ALJ's assessment of Dr. Maguire's observations and conclusions with respect to Plaintiff's credibility is supported by substantial evidence.

Plaintiff also appears to object to the ALJ's reliance on Dr. Cleveland's opinion in assessing her credibility. (Pl.'s Br. at 16; Tr. 17). Plaintiff claims that the ALJ erred in relying on Dr.

21

Cleveland's observations that her daily activities were within normal limits. (Pl.'s Br. at 16). Although the ALJ noted that Dr. Cleaveland reported in October 2011 that the Plaintiff's activities of daily living were within normal limits, the ALJ also noted that Plaintiff herself reported in February of 2012 that she enjoyed cooking, reading and watching movies, and that she had the capability to fold clothes. (Tr. 14, 16-17). To the extent Plaintiff argues that additional evidence weighs against the ALJ's credibility finding, the argument is unavailing because it is not within the court's province to weigh conflicting evidence. Craig, 76 F.3d at 589 (stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]"); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990) (holding that it is the ALJ's responsibility, not the court's, to determine the weight of evidence and resolve conflicts of evidence); Blalock, 483 F.2d at 775 (indicating that even if the court disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence). After review and consideration, the Court finds that the ALJ's credibility analysis is supported by substantial evidence.

## CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. Richardson, 402 U.S. at 390. Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. Blalock, 483 F.2d at 775. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. Shively v. Heckler, 739 F.2d at 989. As previously discussed, despite the Plaintiff's claims, she has failed to show that the Commissioner's decision was not based on substantial evidence.

22

Based upon the foregoing, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

September 16, 2015
Florence, South Carolina